## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MARSH SUPERMARKETS HOLDING, LLC, *et al.*,[1] | ) ) | Case No. 17-11066 (___) |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF (A) AN ORDER (I) SCHEDULING
A HEARING ON THE APPROVAL OF THE SALE OF ALL OR
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR
OF ALL ENCUMBRANCES, AND THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (II) APPROVING
CERTAIN BIDDING PROCEDURES, ASSUMPTION AND ASSIGNMENT
PROCEDURES, AND BID PROTECTIONS AND THE FORM AND MANNER OF
NOTICE THEREOF, AND (III) GRANTING RELATED RELIEF; AND (B) AN ORDER
(I) APPROVING ASSET PURCHASE AGREEMENT, (II) AUTHORIZING THE SALE
OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR
OF ALL ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") hereby submit this motion (this "**Motion**"), pursuant to sections 105, 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**"), for the entry of:  (a) an order, substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures Order**"), (i) scheduling a hearing (the "**Sale Hearing**") on approval of the proposed sale (the "**Sale**") of all or substantially all of the Debtors' assets (the "**Assets**"), free

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Marsh Supermarkets Holding, LLC (1568); Marsh Merger Sub, LLC (8837); Marsh Supermarkets Company, LLC (8179); A.L. Ross & Sons, LLC (3470); Contract Transport Holding, LLC (5675); Contract Transport, LLC (3718); CT Logistics, LLC (9775); LoBill Foods, LLC (9461); Marsh Drugs Holding, LLC (5755); Marsh Drugs, LLC (3717); Marsh International, LLC (0875); Marsh RE Property, LLC (0641); Marsh Supermarkets, LLC (7924); MS Property, LLC (9199); Marsh Supermarkets of Illinois, LLC (6423); and O'Malia Food Markets, LLC (5222).  The mailing address for each of the Debtors is 9800 Crosspoint Blvd., Indianapolis, Indiana 46256.

and clear of all liens, claims, encumbrances, and other interests (collectively, the "**Encumbrances**") other than those permitted by the APA (as defined below), Stalking Horse APA (as defined below) or Modified APA (as defined in the Bidding Procedures) to a potential stalking horse purchaser (a "**Stalking Horse Purchaser**") or, absent any Stalking Horse Purchaser or in the event the Stalking Horse Purchaser is not the Successful Bidder (as defined below), then to the Successful Bidder, and authorizing the assumption and assignment of certain executory contracts and unexpired leases (each, an "**Assumed Contract**," and collectively, the "**Assumed Contracts**") in connection therewith; (ii) authorizing and approving certain bidding procedures for the Sale (collectively, the "**Bidding Procedures**," a copy of which is attached as **Exhibit 1** to the Bidding Procedures Order), certain procedures for the assumption and assignment of the Assumed Contracts (collectively, the "**Assumption and Assignment Procedures**"), certain bid protections for any Stalking Horse Purchaser, including a Break-Up Fee and an Expense Reimbursement (each as defined below and together, the "**Bid Protections**"), and the form and manner of notice thereof; and (iii) granting related relief; and (b) an order, substantially in the form attached hereto as **Exhibit B** (the "**Sale Order**"), (i) authorizing and approving the Debtors' entry into an asset purchase agreement for the Assets substantially in the form attached hereto as **Exhibit C** (the "**APA**"), with any Stalking Horse Purchaser or, absent any Stalking Horse Purchaser or in the event the Stalking Horse Purchaser is not the Successful Bidder, then the Successful Bidder; (ii) authorizing and approving the Sale, free and clear of all Encumbrances other than those permitted by the APA, Stalking Horse APA, or Modified APA; (iii) authorizing and approving the assumption and assignment of the Assumed Contacts in connection therewith; and (iv) granting related relief.  In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated as of February 29, 2012 (the "**Amended Standing Order**"). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

## BACKGROUND

2.      On the date hereof (the "**Petition Date**"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed in these chapter 11 cases and no request has been made for the appointment of a trustee or an examiner.

3.      Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the filing of these chapter 11 cases is set forth in the *Declaration of Lee A. Diercks In Support of Debtors' Chapter 11 Petitions and First Day Motions and Applications* (the "**First Day Declaration**").

4.      Contemporaneously with the filing of this Motion, the Debtors have filed a motion (the "**Motion to Shorten**"), pursuant to Bankruptcy Rule 2002 and Local Rules 6004-

1(c) and 9006-1(e), seeking to have this Motion heard on shortened notice as it pertains to the Debtors' request for the entry of the Bidding Procedures Order.

**THE DEBTORS' SALE STRATEGY**

5.      As set forth in further detail in the First Day Declaration, the Debtors are an independent grocery retailer in Indiana and Ohio, and as of the Petition Date, the Debtors operate a total of 60 stores in Indiana and Ohio (collectively, the "**Remaining Stores**").

6.      Prior to the Petition Date, when the Debtors began experiencing financial difficulties, in addition to a number of other restructuring initiatives, the Debtors, in consultation with their professional advisors, completed a comprehensive review of the performance of all of their retail stores to analyze, among other things, the profitability and viability of each store location.  The results of this analysis led to the Debtors:  (i) ceasing operations at and exiting 11 of their stores (collectively, the "**Dark Stores**"); and (ii) planning an orderly liquidation of and exit from 19 underperforming and/or unprofitable Remaining Stores in an effort to conserve resources and maximize utility (collectively, the "**Closing Stores**").  Accordingly, concurrently with the filing of this Motion, the Debtors have filed a motion seeking to reject the Dark Stores effective as of Petition Date, and a motion (the "**Closing Stores Motion**") for authority to conduct closing store sales at the Closing Stores to the extent that such sales did not finish prior to the Petition Date.[2]

7.      The rest of the Debtors' Remaining Stores collectively represent the Debtors' most valuable store locations (collectively, the "**Core Stores**," a list of which is

---

[2]  The store closing sales finished prior to the Petition Date at 3 of the Closing Stores, which stores the Debtors seek to reject effective as of the Petition Date.  In addition, as set forth more fully therein, the Closing Stores Motion seeks authority to conduct going out of business sales at all of the Remaining Stores.  This way, the Debtors will have maximum flexibility to preserve and maximize the value of their estates in the event that they determine, in their business judgment, that it is necessary and prudent to conduct going out of business sales at any of the Core Stores.  Until any such a determination is made, the Debtors intend to run an orderly and efficient auction and sale process, pursuant to the terms of the Bidding Procedures, for the Core Stores.

01:21893702.1

attached hereto as **Exhibit D**).  As part of the Debtors' overall strategy for these chapter 11 cases, the Debtors have decided, in their  business judgment, to sell all or substantially all of their Assets, including the Core Stores, in order to further maximize recoveries for the benefit of the Debtors' estates and their creditors.

8.    In pursuit of the Sale, in September 2016, the Debtors engaged Peter J. Solomon Company ("**PJS**") as their investment banking advisor to solicit interest from third parties in a going concern transaction.  Additionally, over the past several months, the Debtors were focused on a potential acquisition/merger opportunity, and in early May 2017, they consummated a sale of all of the prescription assets of their pharmacies.  This sale resulted in a substantial reduction of the Senior Prepetition Obligations.  With respect to the going concern sale process, in total, PJS has thus far contacted more than 40 parties, approximately 35 of which have entered into confidentiality agreements in connection with receiving access to the Debtors' confidential information.  Out of the 35 parties who entered into a confidentiality agreement, 5 parties expressed an interest in various groups of stores representing nearly all of the 44 Core Stores.  Despite this interest, going concern buyers for the Debtors have not yet emerged, however, some of these parties are still engaged in active due diligence.  The Debtors, with the assistance of PJS, are continuing to actively market the Assets for sale to potential buyers in connection with these chapter 11 cases.

9.    Although the Debtors have not obtained any stalking horse bids for the Assets as of the filing of this Motion, the Bidding Procedures  reserve the Debtors' right to enter into a Stalking Horse APA (as defined below) with a Stalking Horse Purchaser, and the Debtors will continue to negotiate with interested parties in an effort to secure an acceptable stalking horse bid in advance of the Auction (as defined below).

10.     By this Motion, the Debtors seek authority to proceed with the robust bidding and auction process set forth herein in order to consummate a sale that will generate maximum value for the Assets.  In consultation with their professional advisors, the Debtors developed the Bidding Procedures, which are designed to preserve flexibility in this sale process, and generate the greatest level of interest, and the highest or best value for the Assets. Additionally, by establishing global dates for submitting bids, conducting auctions, and approving the Sale, the Bidding Procedures will provide clarity as to the bidding and auction process to all interested parties, and they create an appropriate timetable for the Sale, consistent with the milestones under the cash collateral order and the Debtors' current liquidity position.

### STALKING HORSE PURCHASER

11.     By this Motion and in connection with the Bidding Procedures, the Debtors are requesting approval to enter into an APA with any Stalking Horse Purchaser (a "**Stalking Horse APA**") not later than nine (9) days prior to the Bid Deadline (as defined below).  The Debtors request authorization, but not direction, to accept an offer from any Stalking Horse Purchaser to purchase the Assets and execute any Stalking Horse APA, subject to the Bidding Procedures.  In the event the Debtors enter into any Stalking Horse APA, the Debtors will file with the Court, and serve on the Sale Notice Parties (as defined below), a notice (a "**Stalking Horse Notice**") that shall include the following: (a) the identification of the Stalking Horse Purchaser; (b) a copy of the Stalking Horse APA; (c) the purchase price provided for in the Stalking Horse APA (the "**Stalking Horse Purchase Price**"); and (d) the deposit paid by the Stalking Horse Purchaser.

12.     The Debtors also seek authorization, but not direction, to provide a break-up fee (a "**Break-Up Fee**") and an expense reimbursement for the reasonable and documented

expenses incurred by any Stalking Horse Purchaser (an "**Expense Reimbursement**") to any Stalking Horse Purchaser on terms that are substantially similar to those routinely approved by bankruptcy courts in this District, provided that (i) in the aggregate, any Break-Up Fee shall not exceed two percent (2%) of the Stalking Horse Purchase Price, (ii) the aggregate amount of any Expense Reimbursement shall not exceed one percent (1%) of any Stalking Horse Purchase Price, and (iii) such Stalking Horse Purchaser is not an insider of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code.  To the extent that the Debtors provide any Stalking Horse Purchaser with a Break-Up Fee or an Expense Reimbursement, the Stalking Horse Notice will also identify the amount and conditions of the same.

## BIDDING PROCEDURES[3]

13.     The Debtors are in the process of soliciting bids for all of the Assets, or any number or combination thereof, in accordance with the Bidding Procedures.  The Bidding Procedures describe, among other things, (i) the assets available for sale, (ii) the manner in which bids become "qualified," (iii) the coordination of diligence efforts among the bidders and the Debtors, (iv) the receipt and negotiation of bids received, (v) the conduct of any Auction, and (vi) the selection and approval of the Successful Bidder and the selection of the Back-Up Bidder. The Bidding Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, manner, while ensuring that the highest or best bid is generated for the Assets.

---

[3]  Any summary of the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order.  To the extent that there is any conflict between any summary contained herein and the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order, the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order shall control.  Capitalized terms used but not defined in this summary of the Bidding Procedures shall have the meanings ascribed to such terms in the Bidding Procedures.

14.    Certain of the key terms of the Bidding Procedures, which shall apply to the Potential Bidder, the Qualifying Bidders, the submission, receipt, and analysis of all bids relating to the Sale, and the conduct of the Sale and the Auction, are included below:

(a)    **Qualification as Bidder**:  Any person or entity that wishes to participate in the bidding process for the Assets (each, a "**Potential Bidder**") must first become a "**Qualifying Bidder**".  In order to become a Qualifying Bidder (and thus being able to conduct due diligence and gain access to the Debtors' confidential electronic data room concerning the Assets (the "**Data Room**")), a Potential Bidder must submit to the Debtors and their advisors:  (i) documentation identifying the interested party, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction; (ii) an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors, which by its terms will inure to the benefit of the Successful Bidder; (iii) a statement and other factual support demonstrating to the Debtors' reasonable satisfaction, after consultation with the Consultation Parties, that the interested party has a *bona fide* interest in consummating a sale transaction; and (iv) sufficient information, as determined by the Debtors, to allow the Debtors, after consultation with the Consultation Parties, to determine that the interested party (x) has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close a sale transaction, including, but not limited to, current audited financial statements of the interested party (or such other form of financial disclosure acceptable to the Debtors in their discretion), and (y) can provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtors and assigned to such bidder, pursuant to section 365 of the Bankruptcy Code, in connection with the Sale.

Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bidding Procedures: (i) any designated Stalking Horse Purchaser shall be considered a Qualifying Bidder, and a Stalking Horse APA shall be considered a Qualifying Bid (as defined below); (ii) should it decide to credit bid, Wells Fargo Bank, National Association (the "**Senior Lien Agent**"), it its capacities as agent and lender pursuant to that certain Credit Agreement, dated as of March 10, 2011 (as amended from time to time prior to the Petition Date, the "**Senior Lien Credit Agreement**"), to which certain of the Debtors and the Senior Lien Agent are parties, is a Qualifying Bidder and any such credit bid will be considered a Qualifying Bid; and (iii) in determining whether the Potential Bidders constitute Qualifying Bidders, the Debtors may consider a combination of bids for the Assets.

(b)    **Due Diligence**:  The Debtors will provide any Qualifying Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances.  All additional due diligence requests shall be directed to: (a) Scott Moses (212-508-1675;

smoses@pjsc.com) or Gregory Grambling (212-508-1674; ggrambling@pjsc.com); and/or (b) Robert S. Brady, Esq. (302-571-6690; rbrady@ycst.com) or Michael R. Nestor, Esq. (302-571-6699; mnestor@ycst.com). The due diligence period shall extend through and including the Bid Deadline. The Debtors may, but shall not be obligated to, in their sole discretion, furnish any due diligence information after the Bid Deadline. The Debtors reserve the right, in their reasonable discretion, to withhold or limit access to any due diligence information that the Debtors determine is business-sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder; provided that the Debtors shall notify the Consultation parties of any decision to withhold such information. Notwithstanding any prepetition limitations, including, without limitation, any non-disclosure, confidentiality or similar provisions relating to any due diligence information, the Debtors and their estates shall be authorized to provide due diligence information to Qualifying Bidders provided that such Qualifying Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtors. The Debtors and their estates are not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, any Qualifying Bidders in connection with the Bidding Procedures and the Sale.

(c)     **Bid Requirements**:

    i.     *Qualifying Bid*. Other than in the case of a bid submitted by the Stalking Horse Purchaser or the Senior Lien Agent, in its capacity as such, to be deemed a "**Qualifying Bid**," a bid must be received from a Qualifying Bidder on or before the Bid Deadline and satisfy each of the following requirements (each, a "**Bid Requirement**"):

        a.     be in writing;

        b.     fully disclose the identity of the Qualifying Bidder and provide the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the bid submitted by the Qualifying Bidder;

        c.     set forth the purchase price to be paid by such Qualifying Bidder;

        d.     not propose payment in any form other than cash (except as otherwise expressly set forth in these Bidding Procedures);

        e.     state the liabilities proposed to be paid or assumed by such Qualifying Bidder;

        f.     specify the Assets that are included in the bid and, to the extent a Stalking Horse Purchaser is designated, state that such Qualifying Bidder offers to purchase the Assets, or a number or combination of the Assets, upon substantially the same terms as, or terms more

favorable to the Debtors and their estates than, the terms set forth in the Stalking Horse APA;

g.    be accompanied by a Modified APA that reflects any variations from the APA and, if applicable, a Stalking Horse APA;

h.    state that such Qualifying Bidder's offer is formal, binding and unconditional and is irrevocable until two (2) business days after the closing of the Sale;

i.    state that such Qualifying Bidder is financially capable of consummating the transactions contemplated by the Modified APA and provide written evidence in support thereof;

j.    contain such financial and other information to allow the Debtors to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to close the transactions contemplated by the Modified APA, including, without limitation, such financial and other information supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, including the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to the Qualifying Bidder, in a form that allows the Debtors to serve, within one (1) business day after such receipt, such information on any counterparties to any contracts or leases being assumed and assigned in connection with the Sale that have requested, in writing, such information;

k.    identify with particularity each and every executory contract and unexpired lease the assumption and assignment of which is a condition to close the transactions contemplated by the Modified APA;

l.    a commitment to close the transactions contemplated by the Modified APA by June 19, 2017;

m.    not request or entitle such Qualifying Bidder to any break-up fee, termination fee, expense reimbursement or similar type of fee or payment;

n.    in the event that there is a Stalking Horse Purchaser, the aggregate consideration proposed by the Qualifying Bidder must equal or exceed the sum of the amount of (A) any Stalking Horse Purchase Price, (B) any Break-Up Fee, (C) any Expense Reimbursement, and (D) $100,000;

01:21893702.1

o.    not contain any contingencies of any kind, including, without limitation, contingencies related to financing, internal approval or due diligence;

p.    contain written evidence satisfactory to the Debtors, in consultation with the Consultation Parties, that the Qualifying Bidder has a commitment for financing or other evidence of the ability to close the transactions contemplated by the Modified APA, with appropriate contact information for such financing sources;

q.    contain a written acknowledgement and representation that the Qualifying Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and other information in making its Qualifying Bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the Sale;

r.    sets forth (i) a statement or evidence that the Qualifying Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings and (ii) any regulatory and third-party approval required for the Qualifying Bidder to close the transactions contemplated by the Modified APA, and the time period within which the Qualifying Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than five (5) days following execution and delivery of such Qualifying Bidder's Modified APA, those actions the bidder will take to ensure receipt of such approval(s) as promptly as possible); provided that a Qualifying Bidder agrees that its legal counsel will coordinate in good faith with Debtor's legal counsel to discuss and explain Qualifying Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Modified APA; provided, further that the offer contains a covenant to cooperate with the Debtors to provide pertinent factual information regarding the bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements;

s.        provides for the Qualifying Bidder to serve as a backup bidder (the "**Back-Up Bidder**") if the Qualifying Bidder's bid is the next highest and best bid (the "**Back-Up Bid**") after the Successful Bid (as defined below), in accordance with the terms of the Modified APA;

t.        includes written evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the Modified APA;

u.        provides a good faith cash deposit (the "**Deposit**") in an amount equal to ten percent (10%) of the purchase price provided for in the Modified APA (or such additional amount as may be determined by the Debtors in their reasonable discretion and in consultation with the Consultation Parties) to be deposited, prior to the Bid Deadline, with an escrow agent selected by the Debtors (the "**Escrow Agent**") pursuant to the escrow agreement to be provided by the Debtors to the Qualifying Bidders (the "**Escrow Agreement**"); provided that with respect to a bid for a store location submitted by the landlord under the real property lease for such store (a "**Landlord Lease Bid**"), the landlord may deduct from its Deposit the amount of any undisputed monetary obligations, as determined by the Debtors, in their discretion, that constitute the cure amount for the applicable real property lease; and

v.        provides for liquidated damages in the event of the Qualifying Bidder's breach of, or failure to perform under, the Modified APA equal to the amount of the Deposit.

A bid from a Qualifying Bidder satisfying all of the above requirements, as determined by the Debtors, in consultation with the Consultation Parties, shall constitute a Qualifying Bid.  The Debtors reserve the right to work with any Qualifying Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualifying Bid.

Each Qualifying Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bidding Procedures; and (b) have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its bid, the Bidding Procedures, and the Sale.

ii.     *Bid Deadline*.  A Qualifying Bidder, other than any Stalking Horse Purchaser or the Senior Lien Agent, that desires to make a bid shall deliver a written and electronic copy of its bid in <u>both</u> PDF and MS-WORD

format to the Notice Parties and the Consultation Parties so as to be received on or before **June 7, 2017 at 5:00 p.m. (ET)** (the "**Bid Deadline**"); provided that the Debtors may extend the Bid Deadline without further order of the Court, subject to providing notice to the Consultation Parties.  **Any party that does not submit a bid by the Bid Deadline will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction.**

iii.    *Evaluation of Qualifying Bids*.  The Debtors will deliver, within one (1) business day after receipt thereof, copies of all bids from Qualifying Bidders to each of the Consultation Parties.  The Debtors, in consultation with the Consultation Parties, shall make a determination regarding whether a timely submitted bid from a Qualifying Bidder is a Qualifying Bid, and shall notify all Qualifying Bidders whether their bids have been determined to be a Qualifying Bid by no later than two (2) days prior to the Auction Date.  In the event that a bid is determined not to be a Qualifying Bid, the Qualifying Bidder shall be notified by the Debtors and shall have until **June 8, 2017 at 5:00 p.m.** to modify its bid to increase the purchase price or otherwise improve the terms of the Qualifying Bid for the Debtors; provided that any Qualifying Bid may be improved at the Auction as set forth herein.  One (1) day prior to the Auction Date, the Debtors shall determine, in consultation with the Consultation Parties, which of the Qualifying Bids, at such time, is the highest or best bid for purposes of constituting the opening bid of the Auction (the "**Baseline Bid**" and the Qualifying Bidder submitting the Baseline Bid, the "**Baseline Bidder**"), and shall promptly notify any Stalking Horse Purchaser and all Qualifying Bidders with Qualifying Bids of the Baseline Bid.

iv.    *No Qualifying Bids*.  If no timely Qualifying Bids other than any Stalking Horse Purchaser's Qualifying Bid are submitted on or before the Bid Deadline, the Debtors shall not hold an Auction and shall request at the Sale Hearing that the Court approve the Stalking Horse APA and the transactions contemplated thereunder.

(b)    **Auction**:  If the Debtors timely receive one or more Qualifying Bids other than any Stalking Horse Purchaser's Qualifying Bid, then the Debtors shall conduct an auction (the "**Auction**").  Following the Auction, the Debtors will determine, in consultation with the Consultation Parties, which Qualifying Bid is the highest or best bid for the Assets, which will be determined by considering, among other things, the following non-binding factors:  (a) the number, type and nature of any changes to the APA and any Stalking Horse APA requested by each bidder; (b) the extent to which such modifications are likely to delay closing of the Sale and the cost to the Debtors and their estates of such modifications or delay; (c) the total consideration to be received by the Debtors and their estates; (d) the transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial

wherewithal to meet all commitments, and required governmental or other approval; (e) the net benefit to the Debtors' estates, taking into account any Stalking Horse Purchaser's rights to any Break-Up Fee and any Expense Reimbursement; (f) the impact on employees, trade creditors and landlords; and (g) any other factors the Debtors may reasonably deem relevant.  The Auction shall be governed by the following procedures:

i.      the Auction shall be held on **June 12, 2017** (the "**Auction Date**"), at a time and location to be determined and announced by a filing on the docket of these chapter 11 cases, or such other date and time as the Debtors, after consultation with the Consultation Parties, may notify Qualifying Bidders who have submitted Qualifying Bids; provided that such other date and time is no earlier than two (2) business days following the delivery of such notice;

ii.     only a Stalking Horse Purchaser, the Senior Lien Agent and the other Qualifying Bidders with Qualifying Bids (together, the "**Auction Bidders**") shall be entitled to make any subsequent bids at the Auction;

iii.    the Auction Bidders shall appear in person at the Auction, or through a duly authorized representative;

iv.     only the Debtors, the Auction Bidders, the Consultation Parties, and all creditors of the Debtors, together with the professional advisors to each of the foregoing parties, may attend the Auction; provided that any such creditors provide counsel for the Debtors one (1) day's written notice of their intent to attend the Auction;

v.      the Debtors and their professional advisors shall direct and preside over the Auction, which shall be transcribed;

vi.     the Auction Bidders shall confirm that they have not engaged in any collusion with respect to the Bidding Procedures, the Auction or the Sale;

vii.    bidding shall commence at the amount of the Baseline Bid, and the Auction Bidders may submit successive bids in increments of at least 2% of the Baseline Bid, provided that:  (i) each such successive bid must be a Qualifying Bid; (ii) if the then-highest and best bid was made by any Stalking Horse Purchaser, such bid shall be deemed to include the sum of the amount of (A) any Break-Up Fee and (B) any Expense Reimbursement; (iii) any successive bid made by any Stalking Horse Purchaser shall only be required to equal the sum of the amount of (A) the Baseline Bid or the then-highest and best bid, as applicable, and (B) 2% of the Baseline Bid, less the sum of the amount of (C) any Break-Up Fee and (D) any Expense Reimbursement; and (iv) the Debtors shall retain the right to modify the bid increment requirements at the Auction;

01:21893702.1

viii.    the Auction may include individual negotiations with any of the Auction Bidders, but all bids shall be made on the record and in the presence of all of the Auction Bidders;

ix.    all material terms of the bid that is deemed to be the highest and best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and the Debtors shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding the Debtors' announcement of the then-current highest and best bid;

x.    the Debtors and their professional advisors in consultation with the Consultation Parties may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time allotted to make subsequent bids) for conducting the Auction, provided that such rules are (i) not inconsistent with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules, or any applicable order of the Court entered in connection with these chapter 11 cases, including, without limitation, the Bidding Procedures Order and the Cash Collateral Order (as defined in the Bidding Procedures Order), and (ii) disclosed to the Auction Bidders;

xi.    each Auction Bidder shall (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of the Auction Bidders, (ii) bring any such action or proceeding in the Court, and (iii) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law;

xii.    the Senior Lien Agent, in its capacity as such, shall be entitled to credit bid all or a portion of the Senior Prepetition Obligations (as defined in the order Cash Collateral Order), in accordance with section 363(k) of the Bankruptcy Code;

xiii.    the Auction Bidders shall have the right to make additional modifications to the Modified APA or any Stalking Horse APA, as applicable, in conjunction with each Qualifying Bid submitted in each round of bidding during the Auction, provided that (i) any such modifications on an aggregate basis and viewed in whole, shall not, in the Debtors' discretion, in consultation with the Consultation Parties, be less favorable to the Debtors and their estates than the terms of any Stalking Horse APA, and (ii) each Qualifying Bid shall constitute an irrevocable offer and shall be

binding on the Auction Bidder submitting such bid until such party shall have submitted a subsequent Qualifying Bid at the Auction or the conclusion of the Sale Hearing, whichever occurs sooner, unless such bid is selected as the Successful Bid or the Back-Up Bid, which shall remain binding as provided for herein;

xiv.      the Debtors and the Consultation Parties shall have the right to request any additional financial information that will allow the Debtors and the Consultation Parties to make a reasonable determination as to an Auction Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified APA or any Stalking Horse APA, as applicable, as may be amended during the Auction, and any further information that the Debtors may believe is reasonably necessary to clarify and evaluate any bid made by an Auction Bidder during the Auction;

xv.       upon the conclusion of the Auction, the Debtors shall determine, in consultation with the Consultation Parties, and subject to Court approval, the offer or offers for the Assets that is or are the highest or best from among the Qualifying Bids submitted at the Auction (the "**Successful Bid**").  In making this decision, the Debtors shall consider, in consultation with the Consultation Parties, the amount of the purchase price, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the APA or any Stalking Horse APA, as applicable, requested by each bidder, and the net benefit to the Debtors' estates.  The bidder submitting such Successful Bid shall become the "**Successful Bidder**," and shall have such rights and responsibilities of the purchaser as set forth in the Modified APA or any Stalking Horse APA, as applicable.   The Debtors may, in their sole discretion, designate the Back-Up Bid (and the corresponding Back-Up Bidder) to purchase the Assets in the event that the Successful Bidder does not close the Sale; and

xvi.      prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

**THE SUCCESSFUL BID AND ANY BACK-UP BID SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE SUCCESSFUL BIDDER AND THE BACK-UP BIDDER, RESPECTIVELY, FROM THE TIME THE BID IS SUBMITTED UNTIL TWO (2) BUSINESS DAYS AFTER THE SALE HAS CLOSED.   EACH QUALIFYING BID THAT IS NOT THE SUCCESSFUL BID OR THE BACK-UP BID SHALL BE DEEMED WITHDRAWN AND TERMINATED AT THE CONCLUSION OF THE SALE HEARING.**

(c)     **Sale Hearing**: The Successful Bid and any Back-Up Bid (or if no Qualifying Bid other than that of any Stalking Horse Purchaser is received, then the Stalking Horse APA) will be subject to approval by the Court.   The Sale Hearing to approve the Successful Bid and any Back-Up Bid (or if no Qualifying Bid other than that of any Stalking Horse Purchaser is received, then the Stalking Horse APA) shall take place on **June 15, 2017**.  The Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a hearing agenda or notice on the docket of the Debtors' chapter 11 cases.

At the Sale Hearing, the Debtors will seek entry of an order that, among other things:  (i) authorizes and approves the Sale to the Stalking Horse Purchaser or, absent a Stalking Horse Purchaser or in the event the Stalking Horse Purchaser is not the Successful Bidder, then to the Successful Bidder, pursuant to the terms and conditions set forth in the Stalking Horse APA or Modified APA submitted by the Successful Bidder, as applicable; (ii) finding that the Stalking Horse Purchaser or Successful Bidder, as applicable, is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code; (iii) as appropriate, exempting the Sale(s) and conveyance(s) of the Assets from any transfer tax, stamp tax or similar tax, or deposit under any applicable bulk sales statute; and (iv) unless otherwise ordered by the Court, directing that all cash proceeds generated from the sale of any Assets shall be paid to the Senior Lien Agent upon the closing of such sale(s) for application against the obligations owing by the Debtors to the Senior Lien Agent in accordance with the terms and conditions of the Cash Collateral Order and the Senior Lien Credit Documents (as defined in the Cash Collateral Order).

(d)     **Backup Bidder**:  Notwithstanding any of the foregoing, in the event that the Successful Bidder fails to close the Sale prior to thirty (30) days after the completion of the Auction  (or such date as may be extended by the Debtors), the Back-Up Bid will be deemed to be the Successful Bid, the Back-Up Bidder will be deemed to be the Successful Bidder, and the Debtors will be authorized, but not directed, to close the Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties.

(e)     **Return of Deposits**:  All Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder no later than five (5) business days following the closing of the Sale.  The deposit of the Successful Bidder or, if the Sale is closed with the Back-Up Bidder, the deposit of the Back-Up Bidder, shall be applied to the purchase price for the Sale.  If the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of such bidder, then, subject to the terms of the Modified APA or any Stalking Horse APA, as applicable, the Debtors and their estates shall be entitled to retain the Deposit of the Successful Bidder (or, if the Sale is to be closed with the Back-Up

Bidder, then the Back-Up Bidder) as part of the damages resulting to the Debtors and their estates for such breach or failure to perform.

(f)    **Reservation of Rights**.  Notwithstanding any of the foregoing, the Debtors and their estates reserve the right to, after consultation with the Consultation Parties, modify these Bidding Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein, allow for bidding on only a portion of the Assets and not all of them, modify bidding increments, waive terms and conditions set forth herein with respect to any or all potential bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and adjourn the Sale Hearing.

(g)    **Cash Collateral Order**.  Notwithstanding anything to the contrary contained in the Bidding Procedures or otherwise:  (i) the right of the Senior Lien Agent to consent to the sale of any portion of its collateral, including, without limitation, any Assets, on terms and conditions acceptable to the Senior Lien Agent, are hereby expressly reserved and not modified, waived or impaired in any way by the Bidding Procedures; (ii) unless otherwise ordered by the Court, all cash proceeds generated from the sale of any Assets shall be paid to the Senior Lien Agent upon the closing of such sale for application against the obligations owing by the Debtors to the Senior Lien Agent in accordance with the terms and conditions of the Cash Collateral Order and the Senior Lien Credit Documents, until such time as all such obligations have been paid in full in accordance with the terms and conditions of the Senior Lien Credit Documents and the Cash Collateral Order; and (iii) nothing in the Bidding Procedures shall amend, modify, or impair any provision of the Cash Collateral Order, or the rights of the Debtors or the Senior Lien Agent thereunder.

15.    The Bidding Procedures establish the following key dates for the sale process:

| Date | Deadline |
|---|---|
| **May 26, 2017** | Assumption Notice deadline |
| **May 29, 2017** | Deadline to Designate Any Stalking Horse Purchaser |

| | |
|---|---|
| **June 7, 2017 at 5:00 p.m.** | Bid Deadline |
| **June 8, 2017 at 4:00 p.m.** | Sale Objection Deadline; Contract Objection Deadline[4] |
| **June 8, 2017 at 5:00 p.m.** | Deadline for Qualifying Bidder to Submit Revised Bid if its Initial Bid was Not Deemed a Qualifying Bid |
| **June 9, 2017** | Deadline for Debtors to Designate Qualifying Bids |
| **June 11, 2017** | Deadline for Debtors to Designate Baseline Bid |
| **June 12, 2017** | Auction, at a time and location to be determined and announced by a filing on the docket of these chapter 11 cases, or such other date and time as the Debtors, after consultation with the Baseline Bidder and the Consultation Parties, may notify Qualifying Bidders who have submitted Qualifying Bids; provided that such other date and time is no earlier than two (2) business days following the delivery of such notice |
| **June 13, 2017** | Deadline to File Notice of Successful Bidder |
| **June 13, 2017** | Deadline to Serve Notice of Successful Bidder and Successful Bidder's Adequate Assurance Information |
| **not later than two (2) hours prior to the commencement of the Sale Hearing** | Adequate Assurance Objection Deadline for Successful Bidders Other Than the Stalking Horse Bidders and for Additional Contracts |
| **June 13, 2017** | Debtors' Deadline to Reply to Sale Objections |
| **June 15, 2017** | Sale Hearing |

---

[4]    This objection deadline applies to all objections to the sale of the Assets, including all objections to the assumption and assignment of the Assumed Contracts (with the exception of objections related to adequate assurance of future performance by a Successful Bidder other than a Stalking Horse Bidder).

01:21893702.1

16.    The proposed timeline for the Sale is driven, in part, by the terms and provisions of the Cash Collateral Order.  The Debtors respectfully submit that the timeline set forth in the Bidding Procedures are reasonable and necessary under the circumstances of these chapter 11 cases.  Such timeline provides an approximately four-week period between the filing of this Motion and the Bid Deadline, which will allow parties in interest sufficient time to formulate bids for the Assets.  Moreover, relevant information regarding the Debtors' businesses has been made available in the Data Room during the Debtors' sale process, allowing potential bidders to conduct diligence on the Debtors' businesses, and the Debtors and their advisors began marketing the Assets prior to the commencement of these chapter 11 cases.  To the extent that any potential bidder has not previously conducted such diligence, such bidder will have immediate access to, subject to the execution of an appropriate confidentiality agreement, the information regarding the Debtors' Assets contained in the Data Room.

**NOTICE PROCEDURES FOR THE SALE,**
**BIDDING PROCEDURES, AUCTION, AND SALE HEARING**

17.    The Debtors also request approval of the sale notice (the "**Sale Notice**"), substantially in the form attached to the Bidding Procedures Order as **Exhibit 2**.

18.    Upon entry of an order approving the Motion to Shorten, on or before May 18, 2017, the Debtors will serve the Sale Notice by email, mail, facsimile or overnight delivery on:  (1) the Office of the United States Trustee for the District of Delaware; (2) counsel to the Senior Lien Agent; (3) counsel to the Junior Noteholder; (4) all parties known by the Debtors to assert a lien on any of the Assets; (5) all persons known or reasonably believed to have asserted an interest in any of the Assets; (6) all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Assets in the Debtors within the six (6) months prior to the Petition Date; (7) the Office of the United States Attorney for the District of

01:21893702.1

-20-

Delaware; (8) the Office of the Attorney General in each state in which the Debtors operate; (9) the Office of the Secretary of State in each state in which the Debtors operate or are organized; (10) all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; (11) all environmental authorities having jurisdiction over any of the Assets, including the Environmental Protection Agency; (12) the Federal Trade Commission; (13) the United States Attorney General/Antitrust Division of Department of Justice; (14) all non-Debtor parties to any of the Assumed Contracts; (16) all of the Debtors' other known creditors and equity security holders; and (17) all other parties that had filed a notice of appearance and demand for service of papers in these chapter 11 cases as of the service date (collectively, the "**Sale Notice Parties**").  On or before that same date, the Debtors will cause the Sale Notice to be published once in the national edition of *USA Today.*

19.     The Debtors will also post the Sale Notice and the Bidding Procedures Order on the website of the Debtors' claims and noticing agent.

## ASSUMPTION AND ASSIGNMENT PROCEDURES

20.     To facilitate the Sale, the Debtors seek authority to assume and assign to any Stalking Purchaser or, absent any Stalking Horse Purchaser or in the event the Stalking Horse Purchaser is not the Successful Bidder, then to the Successful Bidder, the Assumed Contracts in accordance with the Assumption and Assignment Procedures.

21.     The Assumption and Assignment Procedures are as follows:

(a)     On or before May 26, 2017 (the "**Assumption Notice Deadline**"), the Debtors shall file with the Court and serve on each counterparty (each, a "**Counterparty**," and collectively, the "**Counterparties**") to an Assumed Contract a notice, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "**Assumption Notice**").

(b)     The Assumption Notice shall include, without limitation, the cure amount (each, a "**Cure Amount**"), if any, that the Debtors believe is required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy

Code for each of the Assumed Contracts. If a Counterparty objects to (i) the Cure Amount for its Assumed Contract or (ii) the provision of adequate assurance of future performance, the Counterparty must file with the Court and serve on the Objection Notice Parties (as defined below) a written objection (a "**Contract Objection**").

(c)     Any Contract Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801, together with proof of service, **on or before 4:00 p.m. (ET) on June 8, 2017** (the "**Contract Objection Deadline**"); (iv) be served, so as to be actually received on or before the Contract Objection Deadline, upon the Objection Notice Parties; and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code for the Assumed Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto. If any Stalking Horse Purchaser is designated in accordance with the Bid Procedures, any objections to adequate assurance of performance by such Stalking Horse Purchaser shall be filed by the Contract Objection Deadline. Any objections to adequate assurance of future performance by a Successful Bidder other than a Stalking Horse Purchaser shall be filed in accordance with subparagraph (g) below.

(d)     The "**Objection Notice Parties**" are as follows: (i) counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Robert S. Brady, Esq., Michael R. Nestor, Esq., and Robert Poppiti, Jr., Esq.); (ii) proposed counsel to any official committee of unsecured creditors appointed in the Debtors' chapter 11 cases; (iii) counsel to the Senior Lien Agent, Otterbourg P.C., 230 Park Avenue, New York, New York 10169 (Attn: Jonathan N. Helfat, Esq., Daniel F. Fiorillo, Esq., and Chad B. Simon, Esq.); (iv) the Office of the United States Trustee for the District of Delaware, 855 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Hannah McCollum, Esq.); and (v) counsel to the Stalking Horse Purchaser, if any.

(e)     If after the Assumption Notice Deadline additional executory contracts or unexpired leases of the Debtors are determined to be Assumed Contracts, as soon as practicable thereafter and in no event less than two (2) business days before the date of the Sale Hearing, the Debtors shall file with the Court and serve, by overnight delivery, on the Counterparties an Assumption Notice, and such Counterparties shall file any Contract Objections not later than: (i) the Contract Objection Deadline in the event that such Assumption Notice was filed and served within five (5) days of the Assumption Notice Deadline and (ii) two (2) hours prior to the commencement of the Sale Hearing in the event that such Assumption

Notice was filed and served more than five (5) days after the Assumption Notice Deadline.

(f)     No later than one (1) business day after the date of the Auction, the Debtors shall file with the Court a notice identifying the Successful Bidder (a "**Notice of Successful Bidder**"), which shall set forth, among other things, (i) the Successful Bidder and Back-Up Bidder (if any), (ii) the Selected Assumed Contracts (as defined below), (iii) the proposed assignee(s) of such Selected Assumed Contracts, and (iv) a certification by the Debtors that the Debtors have provided, or will provide, in coordination with the proposed assignee, the Successful Bidder's Adequate Assurance Information to each affected Counterparty on a confidential basis.

(g)     No later than one (1) business day after the date of the Auction, the Debtors will cause to be served by overnight mail upon each affected Counterparty and its counsel (if known): (i) the Notice of Successful Bidder and (ii) the Successful Bidder's Adequate Assurance Information (to the extent not previously provided); provided, however, that the Debtors shall provide the Adequate Assurance Information of a Qualifying Bidder that submitted a Qualifying Bid, as soon as practicable after receipt thereof, to such Counterparty that submits a written request to receive the Adequate Assurance Information by email that specifically identifies each property for which such Counterparty would like to receive Adequate Assurance Information.  The Counterparties shall file any Contract Objections solely on the basis of adequate assurance of future performance not later than two (2) hours prior to the commencement of the Sale Hearing.

(h)     At the Sale Hearing, the Debtors will seek Court approval of their assumption and assignment to any Stalking Purchaser or, absent any Stalking Horse Purchaser or in the event the Stalking Horse Purchaser is not the Successful Bidder, then to the Successful Bidder, of only those Assumed Contracts that have been selected by any Stalking Horse Purchaser or, absent a Stalking Horse Purchaser or in the event the Stalking Horse Purchaser is not the Successful Bidder, then the Successful Bidder, to be assumed and assigned (each, a "**Selected Assumed Contract**," and collectively, the "**Selected Assumed Contracts**").  The Debtors and their estates reserve any and all rights with respect to any Assumed Contracts that are not ultimately designated as Selected Assumed Contracts.

(i)     If no Contract Objection is timely received with respect to a Selected Assumed Contract: (i) the Counterparty to such Selected Assumed Contract shall be deemed to have consented to the assumption by the Debtors and assignment to any Stalking Purchaser or, absent any Stalking Horse Purchaser or in the event the Stalking Horse Purchaser is not the Successful Bidder, then to the Successful Bidder, of the Selected Assumed Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by any Stalking Purchaser or, absent any Stalking Horse Purchaser or in the event the Stalking Horse Purchaser is not the Successful Bidder, then the Successful

Bidder); (ii) any and all defaults under the Selected Assumed Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (iii) the Cure Amount for such Selected Assumed Contract shall be controlling, notwithstanding anything to the contrary in such Selected Assumed Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Selected Assumed Contract against the Debtors and their estates or any Stalking Purchaser or, absent any Stalking Horse Purchaser or in the event the Stalking Horse Purchaser is not the Successful Bidder, then the Successful Bidder, or the property of any of them, that existed prior to the entry of the Sale Order.

(j)    To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "**Cure Dispute**"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be determined by the Debtors or fixed by the Court; provided, however, that if the Contract Objection relates solely to a Cure Dispute, the Selected Assumed Contract may be assumed by the Debtors and assigned to any Stalking Purchaser or, absent any Stalking Horse Purchaser or in the event the Stalking Horse Purchaser is not the Successful Bidder, then to the Successful Bidder, provided that the cure amount that the Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by the Debtors or any Stalking Purchaser or, absent any Stalking Horse Purchaser or in the event the Stalking Horse Purchaser is not the Successful Bidder, then the Successful Bidder, pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

(k)    Notwithstanding anything to the contrary herein, if after the Sale Hearing or the entry of the Sale Order additional executory contracts or unexpired leases of the Debtors are determined to be Assumed Contracts, as soon as practicable thereafter, the Debtors shall file with the Court and serve, by overnight delivery, on the Counterparties an Assumption Notice, and such Counterparties shall file any Contract Objections not later than fourteen (14) days thereafter.  If no Contract Objection is timely received, the Debtors shall be authorized to assume and assign such Assumed Contracts to any Stalking Purchaser or, absent any Stalking Horse Purchaser or in the event the Stalking Horse Purchaser is not the Successful Bidder, then to the Successful Bidder, without further notice to creditors or other parties in interest and without the need for further order of the Court, and such assumption and assignment shall be subject to the terms of the Sale Order.

## RELIEF REQUESTED

22.    By this Motion, the Debtors seek entry of: (a) the Bidding Procedures Order, (i) scheduling a date for the Sale Hearing, (ii) authorizing and approving the Bidding Procedures, the Assumption and Assignment Procedures, and the Bid Protections, and the form and manner of notice thereof, and (iii) granting related relief; and (b) the Sale Order, (i) authorizing and approving the Debtors' entry into any Stalking Horse APA or, absent any Stalking Horse Purchaser or in the event the Stalking Horse Purchaser is not the Successful Bidder, then an APA with the Successful Bidder, (ii) authorizing and approving the Sale, free and clear of all Encumbrances, (iii) authorizing and approving the assumption and assignment of the Assumed Contacts to any Stalking Horse Purchaser or, absent any Stalking Horse Purchaser or in the event the Stalking Horse Purchaser is not the Successful Bidder, then to the Successful Bidder; and (iv) granting related relief.

## BASIS FOR RELIEF

**A.    Sufficient  Business Justification Exists for Consummation of the Sale Under Sections 105(a) and 363(b) of the Bankruptcy Code**

23.    Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon the sound business judgment of the debtor.  See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel

Corp.), 722 F.2d 1063, 1070–71 (2d Cir. 1983); In re Abbotts Dairies of Pennsylvania, Inc., 788
F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of In re
Lionel Corp.); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175–76 (D. Del. 1991) (holding
that the Third Circuit adopted the "sound business judgment" test in Abbotts Dairies); Dai-Ichi
Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding
Corp.), 242 B.R. 147, 153 (D. Del. 1999) (same).

24.    The demonstration of a valid business justification by the debtor leads to a
strong presumption "that in making [the] business decision the directors of a corporation acted
on an informed basis, in good faith and in the honest belief that the action taken was in the best
interests of the company." Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.
(In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom,
488 A.2d 858, 872 (Del. 1985)).

25.    The Debtors submit that their decision to consummate the Sale represents
a reasonable exercise of the Debtors' business judgment and, accordingly, the Sale should be
approved under sections 105(a) and 363(b) of the Bankruptcy Code. Among other things, the
Assets, which include the Core Stores, represent some of the Debtors' most valuable store
locations. The Debtors will continue to conduct an extensive and fulsome process to market the
Assets. The open and fair auction and sale process contemplated by the Bidding Procedures will
ensure that the Debtors' estates receive the highest or best value available for the Assets by
allowing the market to test the purchase price of the Assets, and will provide a greater recovery
than would be provided by any other available alternative. Furthermore, compliance with the
Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by

the Stalking Horse Purchaser or other Successful Bidder, and establish that the Debtors and such bidder have proceeded in good faith.

26.     Additionally, the Debtors believe that the notice procedures described above are reasonable and adequate under the circumstances.  Bankruptcy Rules 2002(a) and (c) require the Debtors to notify creditors of the Sale, the terms and conditions of the Sale, the time and place of the Auction, and the deadline for filing any objections.  The Debtors believe that the proposed notice procedures fully comply with Bankruptcy Rule 2002, and are reasonably calculated to provide timely and adequate notice of any Stalking Horse APA, the Sale, Bidding Procedures, Auction, and Sale Hearing to the Debtors' creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in acquiring the Assets.

27.     The Sale conducted in accordance with the Bidding Procedures will generate significant value for the Debtors' estates and represents the best path forward for maximizing recoveries to such estates, the Debtors' creditors, and all parties in interest.  The Debtors submit that ample business justification exists for the consummation of Sale and, therefore, request that this Court approve such Sale.

**B.     The Sale of the Assets Free and Clear of All Encumbrances Is Authorized Under Section 363(f) of the Bankruptcy Code**

28.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

01:21893702.1

-27-

11 U.S.C. § 363(f). This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

29.    Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens and interests. See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a court may approve a sale free and clear if any one subsection is met); see also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same). Furthermore, a debtor possesses broad authority to sell assets free and clear of liens. See In re Trans World Airlines, Inc., 322 F.3d 283, 289 (3d Cir. 2003).

30.    The Debtors submit that, in the interest of attracting the best offers, it is appropriate to sell their Assets on a final "as is" basis, free and clear of any and all Encumbrances (except as otherwise expressly set forth in the Sale Order and a Stalking Horse APA or an APA with a Successful Bidder, as applicable) in accordance with section 363(f) of the Bankruptcy Code because one or more of the tests of section 363(f) are satisfied with respect to such Sale. In particular, the Debtors believe that section 363(f)(2) of the Bankruptcy Code will be met because the Debtors' prepetition secured lenders are secured by, among other things, the Assets and have consented to the Sale, provided that, in the case of the Senior Lien Agent, all cash proceeds generated from the sale of any Assets shall be paid to the Senior Lien Agent upon the closing of such sale for application against the obligations owing by the Debtors to the Senior Lien Agent in accordance with the terms and conditions of the Cash Collateral Order and the

Senior Lien Credit Documents, until such time as all such obligations have been paid in full in accordance with the terms and conditions of the Senior Lien Credit Documents and the Cash Collateral Order, and in the case of the Junior Noteholder, all Encumbrances of the Junior Noteholder attach to the cash proceeds of the Sale in the same order of priority, with the same validity, force, and effect that the Junior Noteholder had prior to the Sale.

31.     Moreover, with respect to any other party asserting a lien, claim, or encumbrance against the Assets, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f).  In particular, known lienholders will receive notice and will be given sufficient opportunity to object to the relief requested.  Such lienholders that do not object to the Sale should be deemed to have consented.  See FutureSource LLC v. Reuters Ltd., 312 F.3d 281, 285-86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); In re Elliot, 94 B.R. at 345 (same).  Consistent with the foregoing, the Bidding Procedures Order provides that the absence of a timely objection to the sale of the Assets in accordance therewith shall be "consent" to such sale within the meaning of section 363(f)(2) of the Bankruptcy Code.

32.     Furthermore, the Debtors propose that any Encumbrances asserted against the Assets be transferred to and attach to the proceeds of such Sale.  Application of the proceeds generated by the Sale will be subject to any applicable provisions of the Cash Collateral Order.

01:21893702.1

C.      **The Sale Should Be Subject to the Protections of**
        **Section 363(m) of the Bankruptcy Code**

        33.     Section 363(m) of the Bankruptcy Code provides, in part, that the reversal

or modification on appeal of an authorization of a sale pursuant to section 363(b) or section

363(c) of the Bankruptcy Code does not affect the validity of a sale or lease under such

authorization to an entity that purchased or leased such property in good faith, whether or not

such entity knew of the pendency of the appeal, unless such authorization and such sale or lease

were stayed pending appeal.  See 11 U.S.C. § 363(m).  In approving the Sale free and clear of

Encumbrances, the Debtors request that the Court find and hold that all purchasers of Assets

purchased in accordance with the Bidding Procedures are entitled to the protections afforded by

section 363(m) of the Bankruptcy Code.  Such relief is appropriate in that selection of the

Successful Bidder will be the result of a competitive bidding process and arm's-length, good-

faith negotiations, and parties in interest will have the opportunity to review and object to a

proposed transaction.  See Esposito v. Title Ins. Co. of Pa. (In re Fernwood Mkts.), 73 B.R. 616,

620 (Bankr. E.D. Pa. 1987) (good faith purchasers are protected under section 363(m) where

notice is provided to lienholders).

D.      **The Court Should Approve the Bidding Procedures**

        34.     The key objective in any sale of property of a debtor's estate is to

maximize the value received by the estate.  See In re Mushroom Transp. Co., 382 F.3d 325, 339

(3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's

assets"); Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery, 330 F.3d 548,

573 (3d Cir. 2003) (same).  Procedures used to enhance competitive bidding support this

objective and, therefore, are appropriate in the context of bankruptcy sales.  See In re O'Brien

Envtl. Energy, Inc., 181 F.3d 527, 537 (3d Cir. 1999); see also Integrated Res. Inc., 147 B.R. at

659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

35.     The Debtors have designed the Bidding Procedures to promote a competitive and fair bidding process and, thus, to maximize value for the Debtors' estates and creditors.  The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the highest or best possible consideration for the Assets.  Furthermore, the Bidding Procedures provide an appropriate framework for the Debtors to review, analyze and compare any bids received in order to determine which bids are in the best interests of the Debtors' estates and their creditors.  Moreover, the Debtors are required under the Cash Collateral Order to complete the auction and sale process on the timetable set forth in the Bidding Procedures, which timetable is fair and reasonable in light of the circumstances of these circumstances of these chapter 11 cases, including the Debtors' current liquidity position.

36.     The Debtors submit that the Bidding Procedures are fair, transparent and will derive the highest or best bids for the Assets.  Therefore, the Debtors request the Court to approve the Bidding Procedures, including, without limitation, the dates established thereby for the Auction and the Sale Hearing.

**E.     The Bid Protections Have a Sound Business Purpose and Should Be Approved**

37.     The Third Circuit has held that, in the bankruptcy sale context, bid protections must provide an actual benefit to a debtor's estate and be necessary to preserve the value of estate assets.  O'Brien Envtl. Energy, Inc., 181 F. 3d at 533; see also In re Reliant Energy Channelview LP, 594 F.3d 200, 206-07 (3d Cir. 2010).  Bid protections may be necessary to preserve the value of the estate if assurance of the such bid protections "promote[s]

more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." See O'Brien Envtl. Energy, 181 F. 3d. at 537.  Additionally, if the availability of such bid protections were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

38.     The Debtors submit that, in the event that there is a Stalking Horse Purchaser, the Bid Protections are necessary and collectively provide the Debtors' estates with the types of benefits generally contemplated by the Third Circuit.  Based on the marketing process that the Debtors and their professional advisors have conducted thus far, the Debtors have determined that the Bid Protections are necessary to attract and retain a Stalking Horse Purchaser.  Indeed, the Bid Protections will be a material inducement for, and in all likelihood a condition of, any offer from any Stalking Horse Purchaser.

39.     Moreover, by inducing a Stalking Horse Purchaser to hold its offer open as a baseline from which other potential bidders can submit higher and/or better offers, the Bid Protections serve to encourage more competitive bidding, which will increase the likelihood that the purchase price of the Assets will reflect their true worth.  As such, the Bid Protections will, among other things, enable the Debtors to maximize the value of their estates for the benefit of all economic stakeholders in these chapter 11 cases.

40.     Furthermore, the Debtors believe that the Bid Protections, which will represent, in the aggregate, no more than three percent (3.0%) of any Stalking Horse Purchase Price, are well within market, and fair and reasonable in amount in light of the size and nature of the proposed Sale, and the efforts that will be have been expended by any Stalking Horse

Purchaser in connection with negotiating and entering into any Stalking Horse APA, which will serve as the baseline for other bids for the Assets.  In addition, given that the Bid Protections are to be paid out of the proceeds of any competing transaction that may be consummated, such payment will not diminish the Debtors' estates.  Finally, no Stalking Horse Purchaser that is an insider of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code, will receive any Bid Protections.

41.     Similar types of bid protections have been approved by this Court.  <u>See</u>, <u>e.g.</u>, <u>In re Haggen Holdings, LLC</u>, Case No. 15-11874 (KG), Docket No. 494 (Bankr. D. Del. Oct. 19, 2015) (authorizing stalking horse break-up fee and expense reimbursement); <u>In re AgFeed USA, LLC</u>, Case No. 13-11761 (BLS) (Bankr. D. Del. Aug. 1, 2013) (authorizing break-up fee of 3% and expense reimbursement of 1%); <u>In re Solyndra LLC</u>, Case No. 11-12799 (MFW), Docket No. 1113 (Bankr. D. Del. Sept. 28, 2012) (authorizing break-up fee of 2.6%); <u>In re AES Thames, L.L.C.</u>, Case No. 11-10334 (KJC) (Nov. 16, 2011), Docket No. 471 (authorizing a break-up fee of $300,000 in the event the debtor entered into a stalking horse purchase agreement with a purchase price of at least $10 million); <u>In re Magic Brands, LLC</u>, Case No. 10-11310 (BLS), Docket No. 267 (Bankr. D. Del. May 18, 2010) (authorizing stalking horse expense reimbursement).

42.     For the foregoing reasons, the Debtors respectfully request that this Court authorize the Bid Protections.

**F.      The Assumption and Assignment of the Assumed Contracts in Connection with the Sale Satisfies Section 365 of the Bankruptcy Code**

43.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The Second Circuit has stated

that "[t]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'" Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098 (2d Cir. 1993) (quoting 2 COLLIER ON BANKRUPTCY ¶ 365.01[1] (15th ed. 1993)).

44.    The standard applied to determine whether the assumption of a contract or an unexpired lease should be authorized is the "business judgment" standard.    See In re AbitibiBowater Inc., 418 B.R. 815, 831 (Bankr. D. Del. 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances."); In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice).  As described above, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.'"    Integrated Res., Inc., 147 B.R. at 656 (quoting Smith v. Van Gorkom, 488 A.2d at 872).  Indeed, "the sole issue is whether the rejection benefits the estate."    In re HQ Global, 290 B.R. at 511.

45.    The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing.    See id.; see also Comm. of Asbestos Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

01:21893702.1

Generally, courts defer to a debtor in possession's business judgment to assume or reject an executory contract or lease. See Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (stating that the business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the executory contract will benefit the estate."); see also N.L.R.B. v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984); Control Data Corp. v. Zelman (In re Minges), 602 F.2d 38, 42-43 (2d Cir. 1979); In re Riodizio, Inc., 204 B.R. 417, 424-25 (Bankr. S.D.N.Y. 1997); In re G Survivor Corp., 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).

46.     Here, the Debtors have exercised their sound business judgment in determining that assumption and assignment of the Assumed Contracts is in the best interests of the Debtors and their estates, and, accordingly, the Court should approve the proposed assumption under section 365(a) of the Bankruptcy Code. See, e.g., In re Philadelphia Newspapers, LLC, 424 B.R. 178, 182-83 (Bankr. E.D. Pa. 2010) (stating that if a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract or unexpired lease); Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.), 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

47.     As set forth above, the Sale will provide significant benefits to the Debtors' estates. To that end, the assumption, assignment and sale of the Assumed Contracts is necessary for the Debtors to obtain the benefits of any APA or Stalking Horse APA, as applicable. In addition, under section 365(k) of the Bankruptcy Code, the assignment by a

debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k). Thus, following an assignment to the Successful Bidder of any Assumed Contract, the Debtors will be relieved from any liability for any subsequent breach associated therewith.

48.     Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured. 11 U.S.C. § 365(b)(1). The Debtors propose to file with the Court, and serve on each Counterparty to an Assumed Contract, an Assumption Notice that indicates the proposed Cure Amount for each such contract. As such, each Counterparty will have the opportunity to object to the proposed assumption and assignment to the Successful Bidder and to the proposed Cure Amount, if applicable. Moreover, the payment or reserve of the applicable Cure Amount, as provided for in the Bidding Procedures, will be a condition to the Debtors' assumption and assignment of any Assumed Contract.

49.     Relatedly, section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2). The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption. See In re Fleming Cos., Inc., 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr.

N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

50.    Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed a willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, the chief determinant of adequate assurance is whether rent will be paid).

51.    Here, the Successful Bidder will have provided adequate assurance of future performance with respect to any Assumed Contract.  In order for its bid to be deemed a Qualifying Bid, each Qualifying Bidder will be required to provide evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code (the "**Adequate Assurance Information**"), including:  (a) the bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to such potential bidder; (b) the name of the proposed tenant that will act as the assignee under any assigned real property lease; and (c) a contact person for the proposed assignee that the Counterparty may directly contact in connection with the adequate assurance of future performance.  To the extent available, the Adequate Assurance Information may also include:  (x) a corporate organization chart or similar disclosure identifying ownership and control of the proposed assignee; (y) the potential assignee's intended use for the space; and (z) financial statements, tax returns and annual reports.  Furthermore, given that the Debtors will submit evidence that all requirements

for the assumption and assignment of such contracts at the Sale Hearing, the Court and other interested parties will have the opportunity to evaluate the ability of each Successful Bidder to provide adequate assurance of future performance.[5]

52.    Therefore, the Debtors respectfully request the Court to (a) approve the proposed assumption and assignment of the Assumed Contracts, and (b) find that all anti-assignment provisions of such contracts to be unenforceable under section 365(f) of the Bankruptcy Code.[6]

## G.    The Senior Lien Agent Should Be Authorized to Credit Bid on the Assets under Section 363(k) of the Bankruptcy Code

53.    Section 363(k) of the Bankruptcy Code provides that, unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of a sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."  11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the full face value of its claim and does not limit the credit bid to the claim's economic value.  See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.), 432 F.3d 448, 459-60 (3d Cir. 2006).

---

[5]  The Debtors will also provide the Adequate Assurance Information to any Counterparty that submits a written request to receive the Adequate Assurance Information by email that specifically identifies each property for which such Counterparty would like to receive Adequate Assurance Information in accordance with the terms of the Bidding Procedure Order.

[6]  Section 365(f)(1) provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease..."  11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

54.     As a result, the Debtors propose that the Senior Lien Agent, in its capacity as such under the Senior Lien Credit Agreement, who holds claims that are secured by valid, binding, enforceable, non-avoidable and perfected liens on and security interests in substantially all of the Assets pursuant to the terms of the Cash Collateral Order, be entitled to credit bid all or a portion of the Senior Prepetition Obligations under section 363(k) of the Bankruptcy Code and as provided for in the Cash Collateral Order and the Bidding Procedures.

**WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h) AND 6006(d)**

55.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Furthermore, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

56.     As set forth throughout this Motion, any delay in the Debtors' ability to consummate the Sale would be detrimental to the Debtors, their creditors and estates, and would impair the Debtors' ability to take advantage of the substantial cost-savings that can be achieved by an expeditious closing of the Sale.

57.     For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h) and 6006(d), to the extent applicable.

**NOTICE**

58.     Notice of this Motion has been provided to: (1) the Office of the United States Trustee for the District of Delaware; (2) counsel to the Senior Lien Agent; (3) counsel to the Junior Noteholder; (4) all parties known by the Debtors to assert a lien on any of the Assets;

(5) all persons known or reasonably believed to have asserted an interest in any of the Assets; (6) all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Assets in the Debtors within the six (6) months prior to the Petition Date; (7) the Office of the United States Attorney for the District of Delaware; (8) the Office of the Attorney General in each state in which the Debtors operate; (9) the Office of the Secretary of State in each state in which the Debtors operate or are organized; (10) all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; (11) all environmental authorities having jurisdiction over any of the Assets, including the Environmental Protection Agency; (12) the Federal Trade Commission; (13) the United States Attorney General/Antitrust Division of Department of Justice; (14) Debtors' thirty (30) largest unsecured creditors (excluding insiders); and (15) all of the landlords for the Debtors' stores. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## <u>NO PRIOR REQUEST</u>

59.     The Debtors have not previously sought the relief requested herein from this or any other Court.

*Remainder of page intentionally left blank*

01:21893702.1

-40-

## CONCLUSION

WHEREFORE, the Debtors request entry of the Bidding Procedures Order and the Sale Order, granting the relief requested herein and such other and further relief as is just and proper.

Dated: May 11, 2017
      Wilmington, DE

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Robert F. Poppiti, Jr.*

Robert S. Brady (No. 2847)
Michael R. Nestor (No. 3526)
Robert F. Poppiti, Jr. (No. 5052)
Ashley E. Jacobs (No. 5635)
Shane M. Reil (No. 6195)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1256

*Proposed Counsel to the Debtors*

01:21893702.1

-41-